UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DERRICK J. SIMS,

            Plaintiff,

    v.

RALPH DIAZ, et al.,

            Defendants.

Case No. 19-cv-05445-SI

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 46

This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 in which Derrick Sims alleges that some defendants were deliberately indifferent to a risk to his safety and some defendants used excessive force on him. Defendants now move for summary judgment on the merits of Sims' claims and on the ground that he failed to exhaust administrative remedies for his excessive-force claim against two defendants. Sims opposes the motion. For the reasons discussed below, defendants' motion for summary judgment will be granted as to all claims except the excessive force claim against defendant McDonald. The case will be referred to the *Pro Se* Prisoner Mediation Program.

## BACKGROUND

A.    <u>Housing Defendants' Alleged Failure To Protect Sims</u>

The Restricted Custody General Population (RCGP) housing unit at Pelican Bay State Prison is described on the website of the California Department of Corrections and Rehabilitation (CDCR) as "a 96-bed unit designed as a transitional program for inmates who are recently released from the SHU to GP that have custodial/security/safety concerns." https://www.cdcr.ca.gov/facility-locator/pbsp. The CDCR created the RCGP as a result of settlement of the *Ashker* class action

United States District Court
Northern District of California

litigation, in which the prisoner-plaintiffs accused CDCR of keeping prisoners in solitary confinement for lengthy periods of time based only upon their affiliation with a prison gang.[1]  *See Ashker v. Newsom*, 968 F.3d 939, 942 (9th Cir. 2020).  The settlement agreement in the *Ashker* case contemplated that inmates who could safely program together on RCGP would join small groups and inmates who could not safely program in small groups would be placed on "walk-alone" status, meaning that their yard time would be in individual exercise modules.  *See id.* at 943.[2]

The parties do not endeavor to evaluate each defendant's actions separately on the failure-to-protect issue; instead, the parties lump these people together and refer to the several defendants who made decisions affecting Sims' placement and housing as the "Housing Defendants."  (Their approach is not an unreasonable one at the summary judgment stage in this case because this is not a "who knew what and when did he know it" sort of case – as defendants note, this is the reverse of the usual failure-to-protect case in which a prisoner claims he voiced safety concerns that prison officials ignored.)  The court will use the same approach as the parties – referring to actors as "Housing Defendants" or "prison officials," without attempting to identify the particular actor.

The following facts are undisputed unless otherwise noted:

Sims arrived at the RCGP on March 24, 2016.  Docket No. 51-1 at 1.

Sims was attacked three times while in the RCGP.  On July 18, 2017, another inmate – identified by prison officials as a member of a Security Threat Group (STG) -- attacked Sims during group yard time.  Docket No. 13 at 23.  On August 6, 2017, "there was a botched attempted stabbing

---

[1] Sims is a member of one or more of the plaintiff classes in the *Ashker* case, as he alleged that he was kept in solitary confinement at Pelican Bay for 14 years.

[2] The court does not take judicial notice of the information from the Ninth Circuit's *Ashker* opinion or treat that information as an undisputed fact.  *See M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) (generally, "a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it"); 21 Charles Alan Wright & Kenneth A. Graham, Jr., Federal Practice & Procedure § 5106 (Supp. 2001) ("courts should distinguish between taking judicial notice of the truth of some extrajudicial fact recited in a court record and the use of those facts for some purpose that does not depend on the truth of the facts recited").  Instead, the information about the RCGP is recited simply to provide a backdrop to the issues raised in this case in which the parties do very little to explain who was in the RCGP or why they were there.

2

assault" on Sims by another inmate.  *Id.* at 25.  A year later, on August 26, 2018, two inmates attacked Sims "from behind with a weapon," but the attack stopped when correctional officers fired shots that hit Sims.  *Id.* at 33.[3]  Prison medical records submitted by Sims show that he was evaluated and cleared for return to custody within about an hour after each incident.  *See* Docket No. 13-1 at 47, 50, 67.

### 1.     Housing Defendants Had Safety Concerns That Sims Rejected

Sims did not believe he was actually in danger when he arrived at the RCGP – he "did not have any concerns" upon his arrival.  Docket No. 51-1 at 1.

Before he arrived at the RCGP, prison officials admittedly had intelligence indicating that Sims might be in danger of being attacked by someone in or associated with the EME (a/k/a Mexican Mafia), a prominent prison gang.  *See* Docket No. 46 at 18.  (Prison gangs are also referred to as STGs.)  The Housing Defendants tried to address safety concerns with Sims but he resisted – sometimes denying safety concerns, sometimes refusing to be interviewed, and usually insisting he would be safe on any general population yard.

Sims refused to be placed in a special needs yard (SNY), a form of protective custody.  On August 1, 2015 – before he went to the RCGP – Sims filed an inmate appeal to complain that prison officials had erroneously reported that he *did* want to be released to a SNY facility when in fact he "*never*, at any time, requested to be released to a SNY facility."  Docket No. 46-6 at 34, 36.  Sims was emphatic: "Under no circumstances did I request such action, nor would I, as I have no sensitive needs and I do *not* wish to be released to a SNY yard and did not state such to any CDCR prison official.  The accurate statement I made was that I requested to go to G.P. because I had no safety concerns and can safely program at any institution within CDCR."  *Id.* at 36.

---

[3] The violence was not all one-sided.  On or about January 22, 2018, Sims feared he would be set up by defendants so he proactively got into an altercation with another inmate and was charged with battery on another inmate.  Docket No. 13 at 31.  On another occasion, Sims kicked another inmate in the face while they both were in restraints.  *Id.* at 25.

Sims' prison record contains numerous documents showing that he was resistant to efforts by prison officials to protect him, both before he was sent to the RCGP and while he was there.[4]

● A November 4, 2015 document labelled "update on safety concerns" described prison officials' consideration of "updated information regarding SIMS' possible safety concerns with the Mexican Mafia (EME) and/or their sympathizers." Docket No. 46-6 at 39. The memorandum stated that a prison official told Sims that the official "needed to interview [Sims] regarding his possible safety concerns with the EME and his possible release to a General Population (GP) Facility," but Sims refused to be interviewed and merely stated "'any general population.'" *Id.* The prison official noted that, based on information in Sims' file, the Corcoran Security Threat Group Investigations Unit "has come to the conclusion" that Sims "continues to have safety concerns with the EME." *Id.* The information in Sims' file that had been reviewed included (a) an April 3, 2015 determination by the Department Review Board (DRB) to retain Sims in administrative security housing unit status "due to safety concerns with the EME"; (b) a July 7, 2015 memorandum indicating that Sims was retained in the SHU "on single cell status due to safety concerns with the EME"; and (c) an October 27, 2015 memorandum about a prisoner's kite that stated that Sims "is currently 'off program' (a term utilized by the EME when referring to an inmate who is in bad standings with the gang)." *Id.* Sims was on the distribution list to receive a copy of the November 4, 2015 memorandum.

● A November 9, 2015, memorandum documented that, pursuant to the *Ashker* settlement, Sims was reviewed by the Institutional Classification Committee (ICC) for consideration of release from administrative SHU segregation where he was housed due to being validated as an associate of EME. Docket No. 46-6 at 41. The memorandum stated that Sims had been asked about

---

[4] Although these records were not properly authenticated by defendants, Sims does not object to or otherwise dispute the authenticity of the prison records attached to the Tartaglio declaration. These records therefore will be considered in evaluating the motion. *See Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.,* 953 F.2d 478, 484–85 (9th Cir. 1991) ("Defects in evidence submitted in opposition to a motion for a summary judgment are waived 'absent a motion to strike or other objection.'"); *id.* at 485 (quoting with approval *Eguia v. Tompkins,* 756 F.2d 1130, 1136 (5th Cir. 1985) ("'[d]ocuments presented in support of a motion for summary judgment may be considered even though they do not comply with the requirements of Rule 56 if there is no objection to their use.'")).

safety concerns if he was released to the general population, and that Sims stated that he was in good standing and could safely program on any GP facility.   The memorandum further stated that Sims "adamantly denied any safety concerns with active members and associates of the EME STG-I and their sympathizers.   [Sims] further stated he is taking the responsibility away from CDCR if something was to happen to him if release[d] to GP."   *Id.*

● An outside attorney wrote on Sims' behalf to a correctional counselor at Corcoran on February 2, 2016 to emphasize Sims' lack of safety worries.   She noted that Sims had been referred to the DRB due to "'security concerns'" and reiterated Sims' position "that he personally has no concerns about his personal safety should [he] be endorsed for general population" and wanted to be sent to general population.  Docket No. 46-6 at 43.

● Sims repeatedly signed forms indicating his desire to be placed in the RCGP and disagreeing with the DRB's determination that he had safety concerns.   Sims signed a form on March 28, 2016, stating:  "I am requesting to be placed in small group activities within the RCGP. I am fully aware of the issues that the CDCR has considered in their determination that I have safety concerns.   I do not concur with their determination.   I have considered all of the information, and am able to safely program in Small Group activities and will refrain from violence with the below listed inmates."  Docket No. 46-6 at 45.  (Interestingly, one of the inmates who Sims vowed not to engage in violence with is the inmate who Sims later kicked in the face.  *Compare id. with* Docket No. 46-5 at 4.)   On August 3, 2016, December 16, 2016, and May 1, 2017, Sims signed the same form (altering it to show he was requesting to be placed in "group activities" rather than "small group activities within the RCGP") and vowing to refrain from violence with additional listed inmates.  Docket No. 46-6 at 47, 51, 53.  On January 14, 2018, he signed the form stating that he was requesting "to be placed in small group activities within the RCGP,"  and stating that he was able to safely program in "all" group activities and vowing to refrain from violence with listed inmates.  *Id.* at 55.   On August 20, 2018, Sims signed the form, stating he was requesting "to be placed in small group activities within the RCGP," and stating that he was able to safely program in small group activities and would refrain from violence with listed inmates.  *Id.* at 57.

1         ● Sims sent a declaration under penalty of perjury to a correctional officer at Pelican

2 Bay on August 11, 2016, stating that the DRB erroneously had reported in an April 14, 2015 memo

3 that he requested SNY placement. *Id.* at 49. He asked that the information be corrected to show

4 that he had requested and was continuing to request GP placement. *Id.*

5         ● Sims submitted a letter to the magistrate judge in *Ashker*, on behalf of himself and

6 several other prisoners, on July 21, 2016. Docket No. 46-1 at 96-104. In the letter, Sims complained

7 that conditions were too restrictive at RCGP, e.g., "[s]ocial interaction with other human-beings is

8 restricted & obstructed only to those one has in his assigned group" and staff prevented

9 intermingling with prisoners outside the assigned group. *Id.* at 96. He complained that he and other

10 inmates "are requesting general population release but have been denied for alleged safety concerns

11 we adamantly deny having." *Id.*

12         ● At an ICC meeting on December 6, 2018, Housing Defendants acknowledged that

13 a confidential memorandum dated October 28, 2018 showed a serious risk of harm to Sims if they

14 put him back into a group in the Pelican Bay RCGP. Docket No. 51-1 at 5. The information was

15 that a confidential informant in RCGP went to a fence that separates general population from RCGP

16 inmates and "was told to Hit [Sims] at all cost order for all STGs in RCGP." *Id.* Sims unsuccessfully

17 asked to be transferred to Corcoran RCGP. *Id.* He remains at Pelican Bay, and some of his

18 statements indicate he is now in on walk-alone status.

19         ● On February 11, 2020, Sims submitted a declaration to the DRB in which he

20 requested that prison officials comply with regulations "and terminate my alleged [gang] Validation

21 and release to GP." Docket No. 46-6 at 59.

22

23       2.      <u>Confidential Information Disclosure Forms</u>

24      The undisputed evidence also shows that Housing Defendants disclosed some but not all of

25 the confidential information they received about the threat to Sims, although some of the disclosures

26 were rather tardy.

27

28

United States District Court
Northern District of California

On January 31, 2017, prison officials provided to Sims two "confidential information disclosure forms"[5] that disclosed to him that they had information indicating he was targeted for assault by the EME prison gang.  Docket No. 13 at 19-21; Docket No. 13-1 at 33-34, 36-37.  One of the forms described information received months earlier by prison officials:

> On June 8, 2016 [an] interview was conducted with a confidential informant (CI) who is a validated associate of the Mexican Mafia (EME) Security Threat Group (STG-I).  The CI disclosed that while at COR from 12/15/2015 through 4/21/2016 he was in communication with two EME associates who were holding positions on the "Mesa" on Facility B.  The EME associates informed the CI of several EME members/associates as being targeted for assault by EME members and affiliates.  "Chim Chim from Mid-City" (Derrick SIMS, J20913) was one of the inmates identified as being targeted by the EME.

Docket No. 13-1 at 33.  The second form given to Sims indicated that another confidential memorandum had been placed in his file reflecting that a prison official had investigated the foregoing information and concluded that, as of October 2016, the threat against Sims still existed. Docket No. 13-1 at 36.

By January 9, 2018, another confidential information disclosure form was given to Sims reporting that a confidential source who was an EME associate provided on June 22, 2017, "a list of priority targets for murder by all surenos.  SIMS was identified as being on the list."  Docket No. 13-1 at 39-40; *see* Docket No. 13 at 23.

Prison officials delivered several confidential information disclosure forms to Sims on February 1, 2019, and more still on March 20, 2020, informing Sims of a risk to his safety from the EME.  Docket No. 51-1 at 5-6.  The confidential information disclosure forms provided to Sims on February 1, 2019, included forms based on confidential information received in July and November 2017, and July 2018 that described risks to Sims' safety from the EME and EME affiliates.  *See* Docket No. 13 at 23, 31; Docket No. 13-1 at 42, 57, 60, 63.

---

[5]The CDCR's confidential information disclosure form summarily describes confidential information that has been obtained by prison officials.  The form is used by prison officials to let the prisoner know that something from a confidential source has been used in a decision about him and describes the item/information in general terms without identifying, for example, the name of the inmate-informant.

3.    <u>Sims Wanted To Go To General Population And</u>

<u>Did Not Want To Be Perceived As A Snitch</u>

At his deposition, Sims agreed that he never told prison officials that he would not be safe if he was in a small group at RCGP.  Docket No. 46-6 at 18-19.  He further testified that he never told prison officials that he had safety concerns and needed to be placed on walk-alone status.  *Id.* at 28.  Sims also testified that, on multiple occasions, he told prison officials that he had no safety concerns, and asked to be transferred to general population.  *Id.* at 28.

Although Sims declares that he had no safety concerns when he arrived at the RCGP, he further declares that he "can not ever admit that anyone resolved anything or I'd be labled [sic] a snitch and have actual safety concerns."  Docket No. 51-1 at 1.  He initially refused to participate in the RCGP program, but eventually "said whatever [he] felt would get [him] to a GP setting asap."  *Id.* at 1-2.  He states that he felt under duress to say what he needed to get to GP because prison officials told him that if he refused to program he would not be released to GP in six months.  *Id.* at 2.

When Sims later filed an inmate appeal to complain that prison officials had failed to protect him, Sims refused in April 2019 to be interviewed for his inmate appeal.  Docket No. 13-1 at 25.

B.    <u>Use of Force By C/O McDonald</u>

On August 6, 2017, Sims was the target of a "botched attempted stabbing assault" by another inmate.   Docket No. 13 at 25.  Sims denies that he was involved in the melee.  Docket No. 51-1 at 3.  He was, however, among the inmates who were handcuffed in efforts to end the melee.  As the handcuffed Sims was being picked up from a prone position, he "kicked another inmate in the face."  *Id.* at 2.  According to Sims, McDonald was picking up Sims when Sims kicked the other inmate.  *Id.*

The parties disagree as to the amount of force used by C/O McDonald to further restrain Sims.  According to Sims, after he was picked up (during which he kicked the other inmate in the face), he stood waiting to be escorted out of the area when C/O McDonald took action.

> Then after like 6 seconds of doing all that, McDonald then slammed me to the ground and pinned me to the ground with all his weight on my back, still not offering any resistance he continued to stay on my back even after all inmates were no longer at the scene. I managed to say "I can't breathe", to which McDonald replied by adding what felt like his full body weight and even pushing both my shoulders to touch the ground at the same time and said "if you can talk you can breathe, shut the fuck up." . . . [He] continued to stay on my back this is well after the incident was way over at least 7 or 10 minutes after.

Docket No. 51-1 at 2-3 (random capitalization omitted). As a result of McDonald's use of force, Sims suffered a "small cut" where the handcuffs dug into his back and injured his right rotator cuff. *Id*. At his deposition, Sims agreed that C/O McDonald was justified in using some force after Sims kicked the other inmate, but not as much force as he did use and not "after the fact." Docket No. 46-6 at 17 (Sims Depo., RT 43). Sims testified at his deposition that C/O McDonald kept his body weight on Sims' back with his knee in the middle of Sims' back for "at least more than a minute or two" but agreed that McDonald did not use further force. Docket No. 46-6 at 16 (Sims Depo., RT 40). Specifically, Sims agreed that he was not punched, kicked, or struck with any weapon by McDonald. *Id.*

According to another inmate, when McDonald stayed on Sims' back, "all the other inmates were already at the hobby shop, there was no other inmates on the ground or around," except inmates who were in holding cells. Docket No. 51-2 at 2.

C/O McDonald declares that he held Sims on the ground until McDonald "determined that it was safe to bring Sims back to his feet." Docket No. 46-5 at 2. C/O McDonald kept Sims pinned on the ground because he "was concerned that Sims's kick was going to instigate further fighting, which could have harmed nearby inmates and staff." *Id.*

C.     Use of Force By C/Os Calkins and Koons

1.     The Incident

On August 26, 2018, Sims was hit by one or two 40 mm. exact impact rounds fired by C/O Calkins and Koons. The 40 mm. exact impact rounds "are sponge-like rounds that are commonly described as 'non-lethal' or 'less-than-lethal.'" Docket No. 46-4 at 2. The parties disagree as to some of the details of the incident, including whether Sims was a participant in the fight.

1

2          According to Sims, he was sitting at the dayroom table and was grabbed from behind by one

3   or more inmates and tried to turn away from their hold to defend himself; as he did so, C/Os Calkins

4   and Koons each shot him once with a 40 mm. exact impact round.  Docket No. 51-1 at 3.  Sims fell

5   and bumped his head; he also had marks from being hit by the 40 mm. exact impact rounds.  *Id.* at

6   3-4.  He also declares that he did not fight back when attacked by the other inmates.  *Id.* at 4.[6]  Sims

7   refused medical care and was returned to his housing unit.  Docket No. 51-1 at 4; Docket No. 51-4

    at 16.

8

9          2.       Administrative Exhaustion Facts For the Incident

10         The parties agree that Sims' inmate appeal dated March 6, 2019 is the only appeal that

11  potentially pertains to the use of force on August 26, 2018, by C/Os Coons and Kalkin.  *See* Docket

12  No. 46-6 at 24-25.

13         Sims' inmate appeal filed on March 6, 2019 was assigned inmate appeal Log No. PBSP B-

14  19-00600.  Sims labelled this appeal a "Staff Complaint, Citizens Complaint," and provided the

15  following explanation of his issue:

16         The constitution requires prisons & jail officials to provide "Reasonable Safety" for
           prisoners.  They must protect them from Assault by other I/m's. & unreasonably
17         Hazardous Living & working conditions.  Prison officials ICC. Members CC11
           Hernandez AKA. Nielson, CC11 C. Durham, Chairperson AW.D. Bradbury, and
18         Warden Jim Robertson, Have acted with Deliberate indifference to the life and well
           being of appellant, By having prior confidential knowledge from multiple C.I.s that
19         allege Appellant to be a Priority Target for murder and or assault, Prior to being
           assaulted Twice.  On two separate incidents.  And disclosed the info, after the
20         attempts were taken.  Via CDCR 1030s.  The above named staff did nothing.  To
           Provide "REASONABLE SAFETY".  Nor did they act upon the allegations instead
21         they allowed it to happen., Which violates the Constitutional Right to be free from
           Cruel and unusual Punishment, *It is worth noting that in one incident appellant was*
22         *actually shot twice by staff while being assaulted*.  Causing Pain and fear of PBSP.

23  Docket No. 13-1 at 20, 22 (errors in source; italics added).  In the section of the form where the

24  inmate is directed to identify the "action requested," Sims wrote:  (1) Consider for Transfer to

25  _____

26  [6] Defendants declare that there was an inmate fight in which Sims was involved, and that both
    defendants shouted to the inmates to "get down" but the inmates failed to do so.  Docket No. 46-3
27  at 2; Docket No. 46-4 at 2.  Defendants admittedly each then fired a 40 mm. exact impact round,
    and declare they did so to try to break up the fight.  Docket No. 46-3 at 2; Docket No. 46-4 at 2.  At
28  the summary judgment stage, Sims' version is accepted as true as he is the nonmoving party.

United States District Court
Northern District of California

1    Corcoran RCGP Due to multiple incidents, (2) Due to staff Deliberate Indifference to Personal

2    safety, Mental and emotional Damages Punitive Damages General Damages for Pain and suffering.

3    Legal fees.  *Id.* at 20 (errors in source).

4         The appeal was initially rejected (on March 12) because Sims had exceeded the allowable

5    number of appeals filed in a 14-day period and the appeal did not meet the criteria to be processed

6    as an emergency appeal.  *See id.* at 24.  Sims re-submitted the appeal.  The appeal bypassed the first

7    level of review and was proceeded to the second level of the three-level review process.  At the

8    second level, Sims refused to be interviewed for the appeal.  *See id.* at 25.  The appeal was "partially

9    granted" in that an inquiry was done and "all issues were adequately addressed."  *Id.*

10        Sims then appealed to the third level.  In his appeal to the third-level, Sims stated that he was

11   dissatisfied with the second-level decision.  He wrote that "To be clear anybody not named in this

12   complaint will be identified in my civil complaint I actually do not need to be naming anyone due

13   to I am DRB controlled and can simply go straight to court but have taken the time incase CDCR

14   attempts to say I do not exhaust administrative remedies."  *Id.* at 21 (errors in source).  He then

15   explained why, in his view, the lower decision was wrong.  In his explanation, he included the

16   statement, "I was also Shot twice while being stabbed C/o J. Hamner Shot me, and it appears a false

17   report was written to justify the Shooting of 08/26/2019."  *Id.* at 23.  The appeal was denied at the

18   third level.  *Id.* at 18-19.  The third-level decision did not mention Sims being shot and instead

19   described the appeal as being "that the members of the Institution Classification Committee (ICC)

20   acted with deliberate indifference to his life and wellbeing by failing to provide him 'reasonable

21   safety.'"  *Id.* at 18.

22

23                          **LEGAL STANDARD FOR SUMMARY JUDGMENT**

24        Summary judgment is proper where the pleadings, discovery and affidavits show that there

25   is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

26   law."  Fed. R. Civ. P. 56(a).  The court will grant summary judgment "against a party who fails to

27   make a showing sufficient to establish the existence of an element essential to that party's case, and

28   on which that party will bear the burden of proof at trial . . . since a complete failure of proof

United States District Court
Northern District of California

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, as when a defendant moves for summary judgment against plaintiff on the merits of the plaintiff's claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W.*

*Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Sims' amended complaint is made under penalty of perjury and therefore is considered as part of the evidence in opposition to defendants' motion for summary judgment.

## DISCUSSION

Sims claims that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when (1) they were deliberately indifferent to a risk to his safety, (2) C/O McDonald restrained him with excessive force after Sims kicked another inmate in the face, and (3) C/Os Calkins and Koons used excessive force when they shot him with 40 mm. exact impact rounds as he was being stabbed by another inmate. Defendants contend that no Eighth Amendment violations occurred and to the extent any did occur, defendants are entitled to qualified immunity because it would not have been clear to a reasonable officer that their conduct was unlawful at the time. Defendants also move for summary judgment on the grounds that administrative remedies were not exhausted for the claim against C/Os Calkins and Koons.

A.    Failure-To-Protect Claim

1.    The Eighth Amendment Duty To Protect From Other Violent Inmates

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual

punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, i.e., "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) the official is, subjectively, deliberately indifferent to the substantial risk of serious harm. *See Farmer*, 511 U.S. at 834.

The focus in this case is the second, or deliberate indifference, prong. Under the deliberate indifference standard, the prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The prisoner "need not show that a prison official acted or failed to act believing that harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

> [P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety,'" a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions." Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Farmer*, 511 U.S. at 844-45 (citations omitted).

### 2.    Analysis

The specific threat of attack from a prison gang suffices to show an objectively sufficiently serious condition for Eighth Amendment purposes. The undisputed evidence that members and affiliates of EME, a prison gang, wanted to assault Sims is sufficient to establish the objective prong of his Eighth Amendment claim.

Sims' claim falters on the subjective prong of the Eighth Amendment analysis. Although it is undisputed that the Housing Defendants were aware of a substantial risk to Sims' safety, no reasonable jury could conclude that they responded to that risk with deliberate indifference. The Housing Defendants' offer to put Sims in the SNY and on walk-alone status in the RCGP show that they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511

U.S. at 844.

The undisputed evidence shows two critical facts that are fatal to Sims' claim:  (1) the Housing Defendants informed Sims that he was at risk of attack by EME members and affiliates, and (2) Sims rebuffed the Housing Defendants' efforts to protect him from that risk of attack.  If the Housing Defendants had only informed Sims that he was at risk of an attack from the EME (or had not mentioned the danger at all), they would not be free from Eighth Amendment liability.  But because they also offered to protect Sims and he refused their offers, they avoid liability.

Sims presents evidence that he had no safety concerns when he arrived at the RCGP in March 2016.  While that may have been his belief, there is an abundance of evidence showing that before Sims' arrival at the RCGP, prison officials discussed safety concerns with Sims and he rejected potential placement in an SNY before he went to the RCGP.  Sims was adamant that he did not want to be placed in an SNY.  *See* Docket No. 46-6 at 34, 36, 49.  Not only did he fault prison officials for saying that he (Sims) said he wanted to be released to an SNY, he asked that the record be corrected to show that he wanted to go to general population because he had no safety concerns at any CDCR prison.  *See, e.g, id.* at 36 ("I have no sensitive needs and I do *not* wish to be released to a SNY yard. . . .  The accurate statement I made was that I requested to go to G.P. because I had no safety concerns and can safely program at any institution within CDCR.")  In November 2015, a prison official tried to interview Sims "regarding his possible safety concerns with the EME" and release to GP; Sims refused to be interviewed and simply indicated he wanted to go to GP.  Docket No. 46-6 at 39.  In February 2016, an attorney working on Sims' behalf reiterated Sims' lack of safety concerns and desire to go to GP.  *Id.* at 43.  On this record, no reasonable jury could find that Housing Defendants failed to alert Sims to the danger from EME or that Housing Defendants failed to offer more protective housing to him before he went to RCGP.

The undisputed evidence also shows that Housing Defendants also discussed potential safety concerns with Sims on many occasions while he was in the RCGP, both before and after he was attacked.  Although the full dialog is not disclosed, Sims signed documents showing his awareness of safety concerns with which he disagreed.  He periodically signed forms indicating his desire to be placed in a small group within the RCGP.  Those forms (signed by Sims in March 2016, August

2016, December 2016, May 2017, January 2018, and August 2018) stated: "I am fully aware of the issues that the CDCR has considered in their determination that I have safety concerns. I do not concur with their determination. I have considered all of the information, and am able to safely program in Small Group activities." Docket No. 35-5 at 45, 47, 51, 53, 55, 57.

The undisputed evidence further shows that prison officials disclosed to Sims that they received confidential information that members and affiliates of the EME prison gang had targeted him for attack. Although some new disclosures occurred in 2019, after he had been attacked three times, the undisputed evidence shows that the same general information was disclosed to Sims in confidential information disclosure forms provided to him on January 31, 2017, months before he first was attacked. Docket No. 31-1 at 33-37. One of those forms said Sims was "targeted for assault by EME members and affiliates." Docket No. 13-1 at 33. Despite this disclosure, Sims continued to sign forms requesting placement "in small group activities within the RCGP" and affirming that he could program safely there. *See, e.g.,* Docket No. 46-6 at 53 (form dated May 1, 2017). Another confidential information disclosure form was given to Sims on January 9, 2018 -- after the second attack but before the third -- indicating that a confidential source told prison officials that Sims was on a list of priority targets for murder by all Surenos. Docket No. 31-1 at 39-40. Despite this disclosure, Sims continued to sign forms requesting placement "in small group activities within the RCGP" and affirming that he could program safely there. Docket No. 46-6 at 55, 57.

Sims faults Housing Defendants for not issuing the confidential information disclosure forms to him until months after the confidential information was obtained. The Housing Defendants' delays in providing these forms to Sims is certainly no cause for commendation but the simple fact is that the delays were inconsequential: even after he received the forms, Sims continued to insist that he was not in any danger from EME and continued to insist he could be placed safely at any prison. Sims offers not a whit of evidence to show that he would have behaved differently or would have avoided the attacks if the confidential information disclosure forms had been provided to him on the very day the confidential information was obtained by Housing Defendants.

Sims' resistance to Housing Defendants' efforts to address the EME threat to him was not merely passive. In addition to declining offers to be put in an SNY custody and signing many forms

indicating he was safe in a small group in the RCGP, Sims took steps to emphasize his rejection of safety concerns.  Sims insisted that his records be corrected to show that he did not wish to be put in an SNY and had never made such a request.  *See* Docket No. 35-6 at 34-36.  He enlisted an attorney to write on his behalf to reiterate his lack of security concerns.  Docket No. 46-6 at 43.  And Sims sent a letter to the magistrate judge in *Ashker* complaining that the conditions were too restrictive at the RCGP, inmates were not allowed to intermingle with many prisoners, and that release to GP had "been denied for alleged safety concerns we adamantly deny having."  Docket No. 46-6 at 96.

Sims' refusal of Housing Defendants' offers to protect him fundamentally undermines his failure-to-protect claim.  The Ninth Circuit has not addressed the question, but several other courts have concluded that an offer of protection that is declined by the prisoner may relieve prison officials of Eighth Amendment liability.  Those courts typically have relied on the proposition that prison officials who know of a substantial risk "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  The offer of protective of custody is viewed as a reasonable response to a known risk and negates Eighth Amendment liability.   For example, in *Brown v. Ellis*, 1999 WL 197222, *1 (7th Cir. 1999) (unpublished), prison official defendants "knew the harm [plaintiff] faced and offered to let him remain in segregation," even though the plaintiff contended that, "because he did not want to return to segregation, [defendants] should have placed him in some other location in the prison.  The court concluded that, "'by offering to allow [plaintiff] to remain in segregation, [defendants] took a reasonable step to protect [plaintiff] from harm" and upheld summary judgment for the defendants on an Eighth Amendment failure-to-protect claim.  *Id.*  Similarly, in a pre-*Farmer* case, the Eleventh Circuit upheld summary judgment for defendants who offered, but plaintiff did not want to go to, protective custody that had harsh conditions.  *Zatler v. Wainwright*, 802 F.2d 397, 403 (11th Cir. 1986); *see id.* ("Zatler does not argue, however, that he was ever refused protective custody, nor does he argue that the conditions of protective custody were cruel and unusual.  Rather, Zatler complains only that he did not like the conditions of protective custody.  Clearly, this does not establish a cause of action for damages against Wainwright for failure to provide Zatler with

1   reasonable protection.   Nor does it establish Wainwright's reckless disregard or deliberate

2   indifference to Zatler's constitutional right to be free from physical assault while in prison.")

3     Several district courts also have rejected Eighth Amendment failure-to-protect claims from

4   prisoners who refused offers of protective custody.  In *Hall v. Arnold,* 2007 WL 3399745 (E. D. Ky.

5   2007), prison officials were aware of a threat to the prisoner and responded by repeatedly offering

6   her the option of entering protective custody; the prisoner "refused these invitations not because

7   Protective Custody would be ineffective to protect her from the very harm she feared, but rather

8   because the conditions of Protective Custody were too restrictive for [her] liking."  *Id.* at *4.  The

9   court in *Hall* was unreceptive to the prisoner's effort to dictate how she should be protected from a

10  known risk:  "A prisoner is entitled to adequate protection from harm, but is not entitled to direct

11  prison officials on the means to accomplish it.  Having repeatedly refused to accept reasonable

12  means of protecting herself through Protective Custody, [the prisoner] cannot now seek to hold

13  prison officials liable for harm to herself that she could reasonably foresee in light of her refusal."

14  *Id.*  Another court dismissed a failure-to-protect claim against prison officials who offered to move

15  the plaintiff soon after he was first attacked where plaintiff declined the offer (because he heard

16  about harsh conditions in the facility) and was attacked again later.  *Rider v. Werholtz*, 548 F. Supp.

17  2d 1188, 1198-99 (D. Kan. 2008).  "Even where the defendants actually knew of a substantial risk

18  of serious harm to the plaintiff, an 'offer of protective custody' 'tends to refute a claim that prison

19  staff acted with deliberate indifference to any such risk.'"  *Id.*  Lastly, in *Belcher v. Loftness*, 2005

20  WL 2323222, at *6 (D. Kan. Sept. 22, 2005), *aff'd sub nom Belcher v. United States*, 216 F. App'x

21  821 (10th Cir. 2007), the court affirmed summary judgment for the defense on failure-to-protect

22  claim where a defendant offered protective custody in response to plaintiff's report of concern about

23  a statement made by another inmate – an offer the plaintiff declined because he wanted to be

24  transferred to another facility and did not want to endure, for an indefinite period, protective

25  custody's harsh conditions that did not rise to the level of cruel and unusual punishment.  The court

26  reasoned that, "'while it may be argued that prison officials have superior knowledge about dangers

27  posed by the prison environment, and about particularly dangerous inmates, no one could have had

28  a more intimate interest in assessing threats to [the plaintiff's] safety than [the plaintiff] himself. . .

United States District Court
Northern District of California

1   . If [the plaintiff] did not feel sufficiently threatened to choose protective custody at OSP, it is hard

2   to see why prison officials were not entitled to take this into account in their own risk assessment."

3   *Id.* at *5.

4          None of these cases from other circuits and other district courts are binding on this court.

5   Yet their reasoning is persuasive and quite consistent with *Farmer*'s discussion of the mental state

6   of deliberate indifference. The offer of protective housing for a prisoner is a reasonable response to

7   a known risk, even if the prisoner does not accept it. On the other hand, this court did not locate

8   any case holding that, regardless of what the prisoner wants, prison officials *must* transfer him to

9   protective custody, an SNY, or walk-alone status when they are aware of a risk to his safety. The

10  circumstances of this case show the dilemma for prison officials when dealing with a prisoner who

11  rejects their efforts to address known safety concerns:   Sims insisted that prison officials were

12  violating his rights by not letting him into GP (where, as Housing Defendants note, he would be

13  exposed to many more people affiliated with the EME); Sims was part of the plaintiff-class in *Ashker*

14  that demanded release from the SHU of many people identified as prison gang members and

15  associates; Sims denies safety concerns; and yet now complains that Housing Defendants did not

16  do enough to protect him.

17         Sims provides evidence that other inmates were removed from RCGP for safety concerns

18  and that a correctional officer once told him that the normal procedure is to place a prisoner in

19  administrative segregation when prison officials learn of a threat.[7] This evidence does not support

20  a reasonable inference of deliberate indifference in the way Housing Defendants dealt with Sims.

21  Sims does not show that the other inmates removed from RCGP for safety concerns had

22  circumstances and safety concerns comparable to his; more importantly, there is no evidence that

23  those inmates refused offers of protection from the Housing Defendants in the way Sims did. The

24  _____

25         [7] After filing this action and while he was alone in a walk-alone area, Sims asked a
    correctional officer "what is the proper procedure or protocol" when officials received confidential
26  information that an inmate is targeted for assault, and was told that they "look to see if anything
    corroborates it then we notify the supervisor and we immediately remove the target from harm by
27  ASU placement pending investigation or transfer to a safer place." Docket No. 51-1 at 4. Sims
    once saw 6-8 inmates removed from RCGP Group 2 and placed on walk-alone status due to a
28  confidential source alleging safety concerns. *Id.*

United States District Court
Northern District of California

evidence that the normal procedure is to place a prisoner in administrative segregation while a threat is investigated does not show deliberate indifference because the evidence shows that the Housing Defendants did investigate the threats against Sims, who adamantly denied he was in danger that would warrant some sort of segregated housing.

Sims urges that his statements that he could program safely in the RCGP were made under duress and because he felt manipulated due to being told he would not otherwise eventually get to GP. Docket No. 51 at 15. He does not show that this amounted to any more than the harsh realities that confront an inmate who faces danger from other inmates. Sims provides no evidence that the Housing Defendants were aware that he held subjective, unannounced actual beliefs that were contrary to the written agreement he signed stating that he safely could be housed in a group in the RCGP. Sims urges that he could not admit to having safety concerns for fear of being seen as a "snitch." Docket No. 51 at 16. What then would be the point of allowing a prisoner to be heard at the various hearings and committee meetings that take place in connection with his housing? If a prisoner's denial of safety concerns could be both true and false, without any repercussions for the prisoner, his input would be useless and prison officials would have something approaching strict liability for placing the inmate in a place where he was later harmed. That is not the law.

Viewing the evidence and reasonable inferences in the light most favorable to Sims, no reasonable jury could conclude that the Housing Defendants were deliberately indifferent to a known risk to Sims' safety. The Housing Defendants are entitled to summary judgment in their favor on the Eighth Amendment claim.

3.    Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory."  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted).  "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties."  *Id.*

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 232.  Although *Saucier* originally required courts to proceed in that exact sequence, the Supreme Court later determined that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate."  *City and County of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted).  This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original; internal quotation marks omitted); *see, e.g., Carroll v. Carman*, 574 U.S. 13, 16–18 (2014) (law not clearly established whether officer may conduct a "knock and talk" at any entrance to a home that is open to visitors, rather than only at the front door); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) (defendants entitled to qualified immunity where "the specific right that the inmates claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was not clearly established at the time"); *Horton v. City of Santa Maria*, 915 F.3d 592, 601–02 (9th Cir. 2019) (officer entitled to qualified immunity on failure-to-protect claim from

pretrial detainee who attempted to hang himself because there was conflicting information as to whether he was suicidal and the case law "was simply too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that [detainee] would imminently attempt suicide").

The Housing Defendants are entitled to qualified immunity against the Eighth Amendment claim.  As explained in the preceding section, Sims does not show a triable issue in support of his claim that the Housing Defendants were deliberately indifferent to his safety in their responses to safety concerns about him.  The Housing Defendants prevail on the first prong of the *Saucier* analysis.

Even if a constitutional violation had been shown, however, the Housing Defendants would prevail on the second prong of the *Saucier* analysis that looks at whether the right was clearly established.  *Farmer* had clearly established the deliberate-indifference test for an Eighth Amendment failure-to-protect claim, but *Farmer* had vastly different facts from Sims' situation and announced the rule at a general level.  The Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (officer entitled to qualified immunity for shooting a woman who was armed with a large knife, was ignoring officers' orders to drop the weapon, and was within striking distance of her housemate; prior cases on excessive force did not clearly establish that it was unlawful to use force under these circumstances, where officer may not have been in apparent danger but believed woman was a threat to her housemate).

No controlling cases had held that prison officials must place an inmate in protective custody, SNY, or on walk-alone status when that inmate is aware of the threat against him, yet refuses such placement.  Indeed, the several cases from other circuits and district courts discussed above determined that prison officials were not deliberately indifferent when they offered protective housing that the prisoner refused to accept.  A reasonable officer in the position of the Housing Defendants would not have understood that it would be unlawful to place and keep an inmate in the small group in the RCGP when both they and the inmate were aware of information that the inmate was targeted for attack by a prison gang and where that inmate adamantly denied any safety

concerns, refused offers of protection, and confirmed that he could safely program in a small group in the RCGP.  The Housing Defendants are entitled to judgment as a matter of law on the qualified immunity defense for the failure-to-protect claim.

B.    Excessive Force Claim Against McDonald

The treatment an inmate receives in custody and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  *Helling v. McKinney*, 509 U.S. 25, 31 (1993). When a prison official stands accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992); *Jeffers v. Gomez*, 267 F.3d 895, 912-13 (9th Cir. 2001) (applying "malicious and sadistic" standard to claim that prison guards used excessive force when attempting to quell a prison riot).  In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  *Hudson*, 503 U.S. at 7; *LeMaire v. Maass*, 12 F.3d 1444, 1454 (9th Cir. 1993).

On the evidence in the record, C/O McDonald is not entitled to judgment in his favor on excessive-force claim against him.  McDonald argues that some force was necessary against Sims because Sims had just kicked another inmate in the face.  But McDonald focuses only on the initial act of taking Sims to the ground while disregarding the acts that took place after Sims was on the ground.

Under Sims' version of the facts, C/O McDonald knelt on Sims' back with all of McDonald's weight for up to ten minutes, continuing to do so even after Sims complained that he could not breathe and even when no other unsecured inmates were nearby.  Sims' evidence that all hostilities had ended and no other inmates were nearby indicates that there was no need for an application of force and no threat reasonably could have been perceived by C/O McDonald.  *See Hudson*, 503 U.S.

United States District Court
Northern District of California

United States District Court
Northern District of California

at 7.  A reasonable trier of fact could find that pinning Sims on the ground when no one else was nearby, under McDonald's full body weight and without regard for Sims' protest that he could not breathe, was done for the very purpose of causing harm to Sims rather than to maintain or restore discipline.  With evidence that there were no inmates nearby and without evidence that McDonald thought Sims might attack staff who were nearby, a reasonable trier of fact might conclude that force was excessive, i.e., that it was unnecessary for McDonald to continuously pin Sims to the ground with McDonald's full body weight for perhaps ten minutes.  Viewed in the light most favorable to Sims, the force unnecessarily used inhibited his ability to breathe and caused a rotator cuff injury for which Sims later needed physical therapy and a cortisone injection.  *Cf. Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–57 (9th Cir. 2003) (police officers' alleged act of continuing to press their weight onto mentally ill detainee's neck and torso as he lay handcuffed on ground and begged for air constituted use of excessive force); *Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018) (discussing whether prohibition against placing weight on arrestee's body after he was handcuffed was clearly established in Sixth Circuit).

C/O McDonald declares that he held Sims on the ground until he determined it was safe to bring Sims to his feet.  But McDonald does not describe the surrounding facts that led to his assessment of the situation, such as the number of inmates who were nearby and whether they were already in cells or potentially able to move about freely.   It cannot be determined from McDonald's scant evidentiary presentation that there actually were people available to attack or be attacked by Sims.  Without such evidence, one cannot say that the force used was used only to restore discipline.  Even if McDonald presented evidence that people were nearby available to attack or be attacked by Sims, that would at most raise a triable issue of fact.

If believed, Sims' version would permit a conclusion that C/O McDonald used excessive force in violation of the Eighth Amendment.  If believed, C/O McDonald's version would permit a jury to conclude that the force used was a reasonable and tempered response in an effort to restore order in the prison.  Summary judgment is not the place for credibility determinations.  Sims has established a "genuine issue for trial'" concerning the circumstances of the use of force on him. *Celotex Corp.*, 477 U.S. at 324 (quoting former Fed.R.Civ.P. 56(e)).  Summary judgment therefore

is not appropriate on the Eighth Amendment excessive force claim against this defendant.

The same facts that preclude summary judgment on the excessive force claim preclude summary judgment on the qualified immunity defense for C/O McDonald. Viewed in the light most favorable to Sims, there were no inmates (who were not secured in cells) nearby as McDonald knelt on Sims for up to ten minutes. On those facts, and with the absence of evidence of some other danger, a reasonable official would not have thought it lawful to pin a compliant handcuffed inmate on the ground, place the official's full body weight on the inmate's back, push the inmate's shoulders to the ground, and refuse to relent when the inmate protested he could not breathe. In other words, when there is no threat to or from the inmate, there is no need for the use of force on him. C/O McDonald has not established his entitlement to qualified immunity against the excessive force claim.

C.   Excessive Force Claim Against Calkins and Koons

    1.   Exhaustion Requirements

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter,* 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90. An inmate "need not exhaust *unavailable* [remedies]." *Ross*, 136 S. Ct. at 1858 (emphasis

added).  An administrative remedy is unavailable if, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or if it is "so opaque that it becomes, practically speaking, incapable of use"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1859–60.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a) (repealed eff. June 1, 2020).[8]  In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the CDCR or his or her designee. *Id.* § 3084.1(b) (repealed eff. June 1, 2020), § 3084.7(d)(3) (repealed eff. June 1, 2020).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures.  *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010)  ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations").  California prisoners are required to lodge their administrative complaint on a CDCR-602 form (or a CDCR 602-HC form for a health care matter).  The level of specificity required in the appeal is described in a regulation:

> (3)  The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue.  To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. . . .

> (4)  The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the [appeal form].

---

[8] The regulations that set out the features of the administrative remedies process for California prisoners underwent a substantial restructuring earlier this year. On March 25, 2020, and effective June 1, 2020, California Code of Regulations Title 15, sections 3084 through 3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487. All the citations in this order to California regulations are to the regulations in place from 2017 through 2019, rather than to the current regulations.

26

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4) (repealed eff. June 1, 2020).[9]  Another regulation provides that "[a]dministrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included" in the originally submitted CDCR-602 inmate appeal form.  Cal. Code Regs. tit. 15, § 3084.1(b) (repealed eff. June 1, 2020).  Yet another regulation requires the inmate to file his CDCR-602 within thirty days of the event.  *Id.* at § 3084.8(b) (repealed eff. June 1, 2020).

Exhaustion of administrative remedies may occur if, despite the inmate's failure to comply with a procedural rule, prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process.  *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016); *e.g., id.* at 659 (although inmate failed to identify the specific doctors, his grievance plainly put prison on notice that he was complaining about the denial of pain medication by the defendant doctors and prison officials easily identified the pain management committee's involvement in the decision-making process).

### 2.    Sims Did Not Exhaust Available Administrative Remedies

Defendants Koons and Calkins have moved for summary judgment on the ground that Sims did not properly exhaust administrative remedies for his claim that they used excessive force by shooting him.  They urge that he did not file any inmate appeal mentioning them or their alleged wrongdoing that received a decision from the third, or highest, level in the inmate appeals system.

---

[9] Several Ninth Circuit cases have referred to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested."  *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting former Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.'"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'").  Those cases are distinguishable, however, because they did not address the regulations as they existed for California prisoners at the time of the events complained of in Sims' amended complaint.  Whatever the former requirements may have been in the CDCR and whatever requirements may still exist in other non-CDCR facilities, since January 28, 2011, the operative regulation has required California prisoners using the CDCR's inmate appeal system to list the name(s) of the wrongdoer(s) in their administrative appeals and to state all facts known regarding the issue being appealed.

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants have carried their burden to demonstrate that there were available administrative remedies for Sims and that Sims did not properly exhaust those available remedies for his excessive-force claim against Koons and Calkins.  The undisputed evidence shows that California provides an administrative remedies system for California prisoners to complain about their conditions of confinement, and that Sims used that inmate appeal system to complain about something mentioned in the amended complaint but not the alleged excessive force by Koons and Calkins.  The only inmate appeal that Sims filed that even mentioned the shooting that received a decision at the third, or highest, level was the inmate appeal at Log No. PBSP-19-0600.  Docket No. 13-1 at 20, 22; *see* Docket No. 46-6 at 24-25.  That appeal was not about the shooting, did not mention either Koons or Calkins by name, and was not filed until more than six months after the shooting.

Sims' single sentence mentioning that he had been shot during an assault did not suffice to exhaust the excessive force claim because, in context, that sentence was part of his argument that urged that correctional personnel had been deliberately indifferent to his safety in their failure to protect him from other inmates who were intent on assaulting him.  His appeal that discussed correctional staff's failure to protect him mentioned several assaults on him and ended with "[i]t is worth noting that in one incident appellant was actually shot twice by staff while being assaulted" as a way to apparently emphasize how bad things had become due to their failure to house him properly.  Docket No. 13-1 at 22.  No reasonable person reviewing that sentence in the context of the inmate appeal would have understood that the inmate appeal intended to complain about that use of force on Sims.  Although "'[t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation,'" *Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016), this single sentence that did not indicate there was something wrongful about the shooting did not alert the prison to the problem and did not suffice to satisfy the standards of § 3084.2(a) to exhaust administrative remedies for this event.

Sims argues that the inmate appeal actually did raise the excessive-force claim because he mentioned the incident but simply provided the wrong name of the correctional staff who used force on him.  This argument is unpersuasive because Sims did not mention *any* name or the date of the use of force until his third-level appeal.  The regulations provide that "[a]dministrative remedies

1   shall not be considered exhausted relative to any new issue, information, or person later named by

2   the appellant that was not included" in the originally submitted CDCR-602 inmate appeal form.

3   Cal. Code Regs. tit. 15, § 3084.1(b) (repealed eff. June 1, 2020).  Even if providing the wrong name

4   could be overlooked, that name was not mentioned until the third-level appeal and therefore the

5   statement did not exhaust administrative remedies for a claim about the shooting.

6         The inmate appeal was not filed until March 6, 2019, more than six months after the

7   August 26, 2018 shooting.  The appeal thus would have been untimely if it was about the shooting,

8   as it was filed more than thirty days after it.  There is no reason to suppose that prison officials

9   would have overlooked this procedural problem.  *See Reyes*, 810 F.3d at 658.

10         Viewing the evidence and reasonable inferences therefrom in the light most favorable to

11   Sims, no reasonable fact-finder could conclude that this inmate appeal that did not mention the

12   names of the correctional officers who shot him, did not mention the date on which the shooting

13   took place, and was filed seven months after the shooting exhausted administrative remedies for an

14   excessive-force claim against Calkins and Koons.

15         As a result of Sims' failure to name the correctional officers who had shot him, identify the

16   date on which the shooting took place, or mention any facts that made him believe their shooting

17   was improper, Sims did not "provide the level of detail required by the prison's regulations," *Sapp*,

18   623 F.3d at 824, and therefore did not properly exhaust his administrative remedies for a claim that

19   C/Os Calkins and Koons used excessive force on him.  *See Ngo*, 548 U.S. at 90.  By failing to

20   provide this information, Sims failed to provide sufficient information to allow prison officials to

21   take appropriate responsive measures to the problem of which he complains in his amended

22   complaint.  Defendants have carried their burden to show that Sims did not properly exhaust his

23   administrative remedies for his claim against C/Os Calkins and Koons.

24         Once defendants met their initial burden, the burden shifted to Sims to come forward with

25   evidence showing that something in his particular case made the existing administrative remedies

26   effectively unavailable to him.  *See Albino*, 747 F.3d at 1172.  Sims fails to make such a showing.

27         Bearing in mind that defendants have the ultimate burden of proof on the defense and

28   viewing the evidence in the light most favorable to Sims, the court concludes that C/O Calkins and

United States District Court
Northern District of California

United States District Court
Northern District of California

Koons are entitled to judgment as a matter of law on the affirmative defense that Sims failed to exhaust administrative remedies for his § 1983 excessive-force claim against them.  The claims against them will be dismissed.

When there is an exhaustion problem that affects part, but not all, of a complaint, the court need not dismiss the entire complaint.  *Jones v. Bock*, 549 U.S. 199, 222-24 (2007) (rejecting "total exhaustion-dismissal" rule); *Lira v. Herrera*, 427 F.3d 1164, 1170 (9th Cir. 2005).  Rather than requiring Sims to file a second amended complaint, it is easier to simply dismiss the unexhausted excessive-force claim against C/O Calkins and Koons because it is not so intertwined with the exhausted part that it is difficult to untangle them.  *Lira*, 427 F.3d at 1175-76.  Accordingly, the excessive-force claim against C/Os Calkins and Koons is dismissed without prejudice to Sims filing a new action against them if he ever properly exhausts administrative remedies for the claim. Having dismissed the claim due to the failure to exhaust administrative remedies, it is not necessary for the court to reach the merits of it.

### D.      Referral To *Pro Se* Prisoner Mediation/Settlement Program

Summary judgment has been granted in most defendants' favor on most claims, but the Eighth Amendment excessive force claim against C/O McDonald remains for adjudication.  With this newly narrowed focus, the case appears to be a good candidate for the court's mediation program.  Good cause appearing therefor, this case is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program.  The proceedings will take place within 120 days of the date this order is filed.  Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the court a report for the prisoner mediation or settlement proceedings.

Plaintiff must attend and participate in the mediation or settlement conference proceedings. The conference may be set up so that he will appear in person, by videoconference, or by telephone; he must attend in whatever format Magistrate Judge Illman chooses.  Plaintiff is cautioned that he may be sanctioned for failure to comply with an order to participate in a mediation or settlement

conference, and such sanctions may include dismissal of part or all of the action.  *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  Docket No. 46.  Summary judgment is granted in favor of the Housing Defendants on Sims' claim that they failed to protect him.  Summary judgment is granted in favor of C/Os Calkins and Koons on the claim that they used excessive force against Sims.  The claim against C/Os Calkins and Koons is dismissed without prejudice to Sims filing a new action against them if he ever exhausts administrative remedies as to that claim.   The motion for summary judgment is denied as to the Eighth Amendment excessive-force claim against C/O McDonald.

The case is now referred to the *Pro Se* Prisoner Mediation/Settlement program to attempt to resolve the remaining claim.  The clerk will send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated:  March 23, 2021

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

31